IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LINDA JOHNSON ,                          §
                                         §
        Plaintiff,                       §
                                         §
v.                                       §        CIVIL ACTION NO. H-08-3658
                                         §
MICHAEL J. ASTRUE,                       §
COMMISSIONER OF THE SOCIAL               §
SECURITY ADMINISTRATION,     §
                                         §
        Defendant.                       §

## MEMORANDUM AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal are Plaintiff's Motion for

Summary Judgment (Document No. 14), and Defendant's Cross Motion for Summary Judgment

(Document No.12), and Memorandum in Support (Document No. 15).  Having considered the

cross motions for summary judgment, the administrative record, and the applicable law, the

Magistrate Judge ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary

Judgment (Document No. 14) is GRANTED, Defendant's Cross Motion for Summary Judgment

(Document No. 12) is DENIED, and the matter is REMANDED for further proceedings.

---

[1]On March 3, 2009, the parties consented to proceed before the undersigned Magistrate
Judge.  Upon consent, the case was transferred to the Magistrate Judge for all proceedings. (Doc.
No. 13).

**I. Introduction**

Plaintiff Linda Johnson ("Johnson") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB").  Johnson argues that substantial evidence does not support the decision of the Administrative Law Judge ("ALJ"), and that the ALJ, Paul W. Schwarz, committed errors of law when he found that Johnson had no severe impairments and was not disabled under the Act.  According to Johnson, the ALJ committed legal error by failing to apply the *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) standard to determine whether Plaintiff's impairments are severe, and she further argues that had the correct standard been applied by the ALJ, he would have found that Plaintiff's impairments, individually or in combination, are severe, particularly in light of the opinion rendered by Johnson's treating physician, Dr. Armstrong, which the ALJ improperly rejected.  Furthermore, Johnson argues the ALJ erred by not obtaining a psychological evaluation in light of Dr. Armstrong's opinion that Johnson's physical complaints are likely affected or worsened due to mental related impairments, including a somatoform disorder.  Johnson seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, remanding her claims for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Johnson was not disabled because she had no severe impairments, that the decision comports with applicable law, and that it should therefore be affirmed.

2

## II. Administrative Proceedings

On April 13, 2004, Johnson filed for DIB benefits, claiming she has been unable to work since July 1, 2002, as a result of various impairments, including left shoulder strain, hip strain, obesity and hypertension. (Tr.56-58).[2]   The Social Security Administration denied her application at the initial and reconsideration stages. (Tr.30-42).  After that, Johnson requested a hearing before an ALJ. (Tr. 42).  The Social Security Administration granted her request and the ALJ held a hearing on June 12, 2006, at which Johnson's claims were considered *de novo*.  (Tr. 435-453).  Johnson testified at the hearing.  According to Johnson, she was injured in a work related accident on or about July 1, 2002.  (Tr. 440).  In describing her pain, Johnson stated: "Okay, like if I mop the floor or pick up something not too heavy, I get a sharp pain in my, in my back and then it go all the way from my back to my feet."  (Tr. 440-441).  Also testifying at the hearing was a medical expert, Dr. Charles Murphy.  Dr. Murphy opined that Johnson had a severe impairment(s) but that she did not meet listing 10.2 and 10.4, and that Johnson had the RFC for medium, unrestricted work.[3]  A vocational expert, Charles Poor, testified that Johnson's earlier

---

[2] "Tr." refers to the transcript of the administrative record.

[3] With respect to the severity of Johnson's impairments, Mr. Murphy testified:
ALJ: The alleged onset date of disability in this lady's case is July 1 of the year 2002, kindly offer your opinion as to any severe impairments on this medical record, whether or not any listing is met or equaled, singularly or in combination with any other listing.  And if not, what your opinion would be as to maximum residual functional capacity please.

ME: Well, she just looking at the impairments, she was diagnosed as having a strain injury of the left hip and shoulder.  This was in July of '02, when she, well, this note is from October of '02, but she had a fall in July of '02, she tripped over something, fell, and complained of pain in the left shoulder and hip.  Exhibit 3F, page 9 and 10 indicate a diagnosis of strain injury and one would expect that to resolve within a period of weeks.  But she did continue to have some complaints, so we have

3

work as a cashier and custodian was light, unskilled work. (Tr. 450-451). On June 30, 2006, the

ALJ issued his decision finding Johnson not disabled. (Tr. 154-163). The ALJ found that

Johnson met the disability insured status requirements for DIB benefits, had not engaged in

substantial gainful activity, had the following severe impairments: left shoulder and hip strain and

obesity, but further found that none of Johnson's impairments or combination of impairments met

or medically equaled one of the listed impairments. The ALJ further found that Johnson had the

residual functional capacity to lift and carry 50 pounds occasionally, and 25 pounds frequently,

stand and walk 6 hours in an 8 hour day, and sit for about 6 hours in an 8 hour day. The ALJ

heard testimony from a medical advisor about Johnson's alleged impairments and also heard

---

radiographic studies. The routine x-rays of the hips were normal, left hip was normal; left shoulder showed a small osteophyte, so there was some degenerative disease, mild, and that was Exhibit 2F, page 7. She also had MRI scans, Exhibit 2F, page 5, and the left shoulder showed some, some mild degenerative change; the hips were both normal. She was basically declared to be at her maximum medical improvement by January of '03, and went through work earning, she did have some mild residual loss of shoulder motion and that, that was the only residual. Now, she did later complain of some pain in the back and left shoulder blade, this is Exhibit 4F, 19, and she just, they just made an assessment of muscle spasms. She did have a thoracic x-ray showing mild scoliosis and a bone spur at T11-12, that's 4F page 20. So, the left scapula was normal, 4F, page 21. And so she has, she had a fall and a, what they called a strain injury of the left shoulder and hip, there's no impairment residual from the hip; in the shoulder she had, does have some mild degenerative change; and then the thoracic spine some mild thoracic spondylosis. And, but basically she has been very, has been very functional. She was, let's see Exhibit 4F, page 11 indicates she complained of low back pain after a fall, it looks like while playing basketball; that was in, that looks like January of '05. And then August of '05, 4F, page 9, she had another fall playing tennis. And they just make a diagnosis of muscle spasm. I would that that obesity is also an impairment, her weights have been, you know, in the 270's, 280's. And those are the severe impairments. So mild thoracic scoliosis and mild degenerative spondylosis of the thoracic spine, and mild degenerative joint disease of the left shoulder, and obesity. (Tr. 446).

4

testimony from Johnson. Based on Johnson's RFC, and the testimony of a vocational expert,[4] the

ALJ opined that Johnson could perform her past relevant work as a school janitor and cashier,

and therefore, was not disabled within the meaning of the Act through December 31, 2003, the

date she was last insured.

Johnson then asked for a review by the Appeals Council of the ALJ's adverse decision.

(Tr. 164-166).  Johnson argued that the matter should be remanded because the ALJ failed to

properly advise Johnson of her right to be represented by counsel and that the matter should also

be remanded for consideration of new and material evidence from Johnson's treating physician,

Dr. Davill Armstrong, which suggested that Johnson, in addition to her previously documented

conditions,  also had a mental impairment and carpal tunnel syndrome, and that based on these

impairments she was not able to perform medium work.[5]  The Appeals Council will grant a

---

[4] The vocational expert testified as follows:
ALJ: All right, sir, now let me ask you this hypothetical question.   Given a
hypothetical individual 45 years of age, who has a twelfth grade education but who
has received a high school diploma; however, who possesses the ability to read and
write and perform basic mathematic functions, addition, subtraction, multiplication
and division.  Who further, from an exertional standpoint, has a residual functional
capacity for medium work as that term is defined in the Code.  I'll ask you whether
or not such a hypothetically described individual could perform any of the past
relevant work, which you've identified?

VE: Yes, sir, in my opinion such an individual as you've described could do the work
of a cashier and as a janitor/custodian.

ALJ: All right.  Now in the second hypothetical, if the residual functional capacity
were reduced to that for light work, would your answer be the same?

VE: Yes, sir, it would.  (Tr. 451-452)

[5]On August 10, 2006, Dr. Armstrong completed a physical RFC, in which he opined, based
on his 21 year treating relationship with Johnson, that she had left shoulder, left hip, lumbar strain and
that her symptoms included "pains left shoulder, hip and lower back."  Dr. Armstrong further opined

request to review an ALJ's decision if any of the following circumstances are present:  (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 416.1470.  After considering Johnson's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on August 15, 2007, that there was a basis upon which to grant Johnson's request for review, and the matter was remanded to the ALJ.  (Tr. 185-189).  According to the Appeals Council Order of Remand, that ALJ was instructed to conduct a new hearing and to consider any additional evidence relating to Johnson's alleged impairments (left shoulder and hip strain and obesity).  (Tr. 188-189).

With respect to Johnson's alleged left shoulder impairment, the objective medical evidence shows Johnson fell and injured herself at work on or around July 31, 2002.[6]  Johnson initially was treated by Dr. Armstrong.  Johnson's first appointment with Dr. Armstrong was on August 5, 2002.  (Tr. 211).  She reported that she slipped and fell on exercise equipment.  Johnson had a decreased range of motion in her left shoulder.  (Tr. 211).  An x-ray taken on August 5, 2002, showed no acute abnormality.  (Tr. 221).  However, at Johnson's August 7, 2002, appointment

---

that Norpak 500 mg, may cause stomach ulcers.  In addition, Dr. Armstrong identified emotional factors (somatoform disorder, psychological) that would interfere with Johnson's attention and concentration.  Dr. Armstrong opined that Johnson was disabled but did not give a date that she became disabled.  (Tr. 203-207).

[6] The medical records before the alleged date of disability (July 1, 2002) show that Johnson injured her back at work in 1988.  A lumbosacral x-ray that was taken on August 19, 1988, showed Johnson had "narrowed L-5/S1 interspace on plain films and mild central disc bulge of the L-5/S-1 disc on computed tomography."  (Tr. 422).  Johnson was treated at an emergency room on July 20, 1989, for back pain.  Her exam was normal except for pain on the left at about 60 degrees.  (Tr. 410-11).

with Dr. Armstrong, her range of motion in her left shoulder joint was restricted on abduction and

she had a contusion and strain. (Tr. 222).  At her second appointment on August 16, 2002, she

complained of shoulder pain. (Tr. 212).  On September 12, 2002, she was seen at the Doctors

Hospital-Tidwell.  X-rays of the left shoulder showed no fractures or dislocations.  (Tr. 102).  A

MRI revealed:

> There is normal alignment without fractures or bone marrow abnormalities.  A
> subchondral cyst is noted in the superior lateral aspect of the left humeral head
> consistent with mild rotator cuff insertion site degeneration change.  The rotator
> cuff is intact without evidence of tendinopathy, partial or full thickness tear.  The
> biceps tendon is normal within the bicipital groove.  The subscapularis tendon is
> intact.  The glenoid labrum is unremarkable.  There is a concave contoured
> acromion noted.  The shoulder girdle musculature shows no atrophy.  (Tr. 100).

Thereafter, Johnson was examined by Dr. John DeBender on October 1, 2002.  (Tr. 111-112).

With respect to Johnson's left shoulder, Dr. DeBender wrote:

> The patient had a full range of motion of the shoulder with pain at the end of
> motion.  There was no swelling present.  Mild tenderness was present over the
> anterior and lateral acromial area.  There was no point tenderness over the
> acromioclavicular or sternoclavicular joints.  The gleno-humeral joint was stable.
> No winging of the scapula was detected.  Sensation was normal.  There was good
> strength with abduction and elevation.  (Tr. 111).

Based on the objective clinical findings and the results of the MRI, which suggested mild

degenerative changes, Dr. DeBender recommended that Johnson participate in a work hardening

program.

Johnson had a follow-up appointment with Dr. DeBender on December 10, 2002.  (Tr.

110).  Dr. DeBender wrote:  "She had completed work hardening program and she has

symptomatically much improved.  Her neurological evaluation is normal."  (Tr. 110). Johnson had

a follow up appointment with Dr. Armstrong on December 20, 2002, and Dr. Armstrong

confirmed that Johnson had a full range of motion of her left shoulder.  (Tr. 209).  Dr. DeBender completed a medical evaluation, including an impairment and Functional Assessment on January 14, 2003.  (Tr. 106-109). Dr. DeBender opined that  Johnson had reached maximal medical improvement under the Worker's Compensation Act as of January 14, 2003, and that she had a 4% whole person impairment based on her injury to her left hip (2% impairment) and left shoulder (2% impairment).  On January 22, 2003, Johnson returned to Dr. Armstrong  complaining of left shoulder strain.  (Tr. 209).  Johnson was treated for left shoulder pain on May 16, 2003.  According to Dr. Armstrong's treatment note, she had decreased range of motion in her shoulder.  Dr. Armstrong injected Bextra, a non-steroidal anti-inflammatory.  (Tr. 208, 210).

On December 12, 2003, Johnson was seen by Dr. Kymberly Butler at the Harris County Hospital District Acres Home Nursing Station, following a fall.  Dr. Butler noted that Johnson had left thoracic muscle spasms and muscle pain. Based on x-rays, and her exam, Dr. Butler opined that Johnson had mild scoliosis.  (Tr.131, 132). A x-ray of the left scapula was normal.  (Tr. 133).

In addition to left shoulder pain, Johnson complained of and was treated for left hip strain.  She injured her hip at the same time she injured her left shoulder on or about July 1, 2002.  Following her injury, Johnson was seen by Dr. Armstrong on August 5, 2002, August 7, 2002, and again on August 16, 2002.  She had tenderness in the left hip and a decreased range of motion on extension.  (Tr. 211, 212, 222).  An x-ray that was taken on August 5, 2002, revealed no abnormalities.  (Tr. 221).  A x-ray and MRI that were taken on September 12, 2002, likewise were normal. (Tr. 100, 102).  At Johnson's October 1, 2002, appointment with Dr. John J. DeBender, he noted that she "had pain with internal and external rotation of the hip.  There was

8

full flexion and extension, and her neurovascular status was intact."  Based on this objective exam and the MRI results, Dr. DeBender opined she had "strain."  (Tr. 111).  Dr. DeBender performed a follow up evaluation on December 30, 2002, in which he stated that Johnson had completed work hardening and was "symptomatically much improved."  According to Dr. DeBender, with respect to Johnson's left hip, she was 2% impaired.

Following the date she was last insured, December 31, 2003, the medical records show that Johnson continued to complain of pain with her left hip and shoulder but also complained of spinal pain. Johnson's complaints were substantiated on x-rays.  On March 3, 2004, Johnson was told to discontinue Ultran, a non-steroidal anti-inflammatory and to use ibuprofen.  She was told to exercise**.** (Tr. 125).  Johnson was seen at the emergency room on January 10, 2005, complaining of back pain.  The treatment note shows that her left thoracic spine was tender to palpatation.  (Tr. 123).  She was treated for a muscle spasm and hand pain on August 12, 2005. (Tr. 121). A thoracic spine x-ray that was taken on October 5, 2005, revealed she had mild scoliosis.  (Tr. 257).  Lumbar spine x-rays that were taken in June 2006, revealed "mild degenerative changes with early osteophyte at L2-3.  (Tr. 241, 258).  On July 14, 2006, Johnson was seen by Dr. Davill Armstrong for her complaints of hand numbness and tingling that had lasted two months.  Dr. Armstrong diagnosed carpal tunnel syndrome. (Tr. 202).  On October 11, 2006, Johnson was examined by Dr. Butler at the Harris County Hospital District.  (Tr. 234-235).  No abnormalities were noted on the treatment record.  (Id).  On November 24, 2006, Johnson sought treatment for neck pain.  According to the treatment note, Johnson had a full range of motion without pain and a steady gait and overall no abnormalities were noted.  (Tr. 301-302).

At her appointment on December 20, 2007, Johnson had generalized tenderness over her back. (Tr. 225).

Johnson also complained of and had been treated for hypertension.  The medical records for the relevant time period, July 1, 2002, through December 31, 2003, show that Johnson's hypertension was well controlled.[7]  However, readings after the date she was last insured, December 31, 2003, forward show less control.[8]

Finally, with respect to Johnson's weight, the medical records during the relevant period of time, July 1, 2002, through December 31, 2003, show that as of December 11, 2003, Johnson weighed 283.2 pounds.  (Tr. 131).  Johnson's weight varied little during this period.  (December 20, 2002, 288 pounds (Tr. 209); January 22, 2003, 288 pounds (Tr. 209); May 16, 2003, 280 pounds (Tr. 208); and May 16, 2003, 280 pounds (Tr. 210).  Johnson's weight showed little fluctuation subsequent to the date she was last insured.  *See*:  February 1, 2004, 276 pounds (129); March 1, 2004, 276 pounds (Tr. 127); March 3, 2004, 280 pounds.  She was told to exercise.  (Tr. 125, 280); May 14, 2004, 273 pounds (Tr. 124); January 10, 2005, 280 pounds (Tr. 123); August 12, 2005, 282 pounds (Tr. 121); November 19, 2005, 286 pounds (Tr. 208,

---

[7] A sampling of Johnson's blood pressure readings from 2002 and 2003 follows: January 17, 2002, 140/90 (Tr. 214); March 9, 2002, 120/80 (Tr. 213); May 6, 2002, 120/80 (Tr. 211); December 20, 2002, 120/80 (Tr. 209); January 22, 2003, 120/80 (Tr. 209); May 16, 2003, 120/80 (Tr. 208); and December 11, 2003, 149/73 (Tr. 131).

[8] A sampling of post December 31, 2003, readings are as follows:  February 1, 2004, 156/96 (Tr. 129, 276); March 1, 2004, 156/96 (Tr. 127); March 3, 2004, Tr. 146/87 (Tr. 125); May 14, 2004, 130/82 (Tr. 124); January 10, 2005, 140/90 (Tr. 123); August 12, 2005, 138/70 (Tr. 121); November 19, 2005, 120/80 (Tr. 208, 210); July 14, 2006, 148/90 (Tr. 202); October 11, 2006, 140/90 (Tr. 234, 235); October 22, 2007, 130/80 (Tr. 230); December 20, 2007, 140/90 (Tr. 225); and January 4, 2008, 140/90 (Tr. 224).

210); October 11, 2006, 290 pounds (Tr. 234), October 22, 2007, 293 pounds[9] (Tr. 229-230),

December 20, 2007, 285 pounds (Tr. 225); and January 4, 2008, 285 pounds (Tr. 224).

A second hearing was held on April 2, 2008, before the same ALJ.  (Tr. 454-494).

Testifying at this hearing was Johnson, a medical advisor, Dr. Oguejiofer, and a vocational expert,

Joel Quintela.  Again, Johnson testified about her work duties as a school custodian.  According

to Johnson, she fell on the job, on her left side, injuring her shoulder, back and hip.  Johnson

stated that she cannot work because "my back and my hip, because I have a lot of, a lot of pain."

(Tr. 467).  Johnson testified that she weighed 285 pounds, and was five foot five inches tall.  (Tr.

466).  According to Johnson, she had talked to her doctor about her weight "in a way."  (Tr.

467).  Johnson stated that she had tried to diet.  (Tr. 467).  With respect to shopping, Johnson

testified that her husband and son do the shopping.  (Tr. 468).  In addition, Johnson stated that

the medication makes her sleepy and dizzy and as a result, much of her day is spent laying down

for up to four hours.  (Tr. 469-470).  Johnson testified that she has pain and tingling in her hands.

(Tr. 471).  Johnson stated she wears a left splint at home.  (Tr. 474). Johnson described every day

as being a bad day and that "I'm in a bad mood when I'm in a lot of pain."  (Tr. 473).  Johnson

stated that she stopped taking Effexor.  (Tr. 473).  Because she gets dizzy, Johnson testified that

she does not drive.  (Tr. 474).

Also testifying at the hearing was a medical advisor, Dr. Oguijiofer.  With respect to

Johnson's impairments, Dr. Oguijiofer testified as follows:

---

[9] This examination note shows that while Johnson's extremities were normal, her neurological exam showed abnormalities.  For instance, as to her hand, Johnson had decreased sensation on her right hand.  She had a positive phalens.  Her strength was 5/5.  (Tr. 229-230).

11

The ALJ:  All righty, Dr. Oguijiofer, the alleged onset of disability in this lady's case is July 1, 2002.  This is a Title II case only, and the date last insured, as counsel has pointed out and the Court agrees, is December 31, 2003.  So from the alleged onset date up until and through the date last insured, I need to have your opinion as to the severe impairments on this medical record, whether or not you believe any listing would be met or equal, singular or in combination with any other listing, and if not, what you believe a reasonable functional capacity assessment would be for this lady during that period of time.  Now you may naturally consider, as I always instruct, that events prior to the alleged onset day may be considered, to the extent that they're clinically relevant, to a condition which would persist after the alleged onset date.  Okay.

ME:  Thank you.  Your Honor, I do not believe that I see any evidence for a severe physical limitation in the record.  She fell at work in, in August of 2002 on her left shoulder and left hip.  She was given a diagnosis of left shoulder contusion and sprain, and also left hip contusion and sprain.  These are the records from Dr. Armstrong, and we're trying to give you the exhibit number, Your Honor.

*                                              *


—on August the 5th of 2002, which was reported as showing no fracture, no dislocation, subluxation identified.  No radio opaque foreign body was seen.  X-ray of her left hip was reported, again, as showing no abnormalities, your Honor.  So this was August of 2002.  She did see an orthopaedic surgeon on Exhibit 3-F, pages 9 to 10, your Honor, where she was evaluated for pain in her left shoulder and left hip.  She stated that she tripped at work and fell.  And again, physical examination did not show any severe limitation.  She was given a diagnosis of strain of the left hip and left shoulder.  The other issues in the record, she's got high blood pressure, which is controlled on the Avapro and hydrochlorothiazide.  Looking at, trying to give you the exhibit number here, your Honor, again, 8-C, page 14.  This is well outside the period you gave me, which is July 14th of 2006, she had gone in to see Dr. Armstrong, complaining of numbness and tingling for two months in both hands.  Really not a lot of physical exam at that day.  And here, on that diagnosis, number one, hypertension.  Number two, hands, numbness and tingling, carpal tunnel syndrome.  That's all I see with regards to the carpal tunnel syndrome.

ALJ:  Okay.

ME:  Very extensive records of obstetric problems, your Honor.

ALJ:  Mm hmm.

12

ME:  On Exhibit 10-F, pages 1 to 29, she had problems with eclampsia.  She's had problems with fetal distress, your Honor, at pregnancy.  There were no, you know, no limitations that I can see from that.  Looking at 10-F, page 128, goes back to August 19th of 1988, where she had x-ray of her lumbar spine, reported as showing narrowed L5/S1 interspace with mild central disk bulge on computed tomography.  This was way back in 1988.

ALJ:  Mm hmm.

ME:  Plus, looking at page 116, Exhibit 10-F, she went to the emergency room, Memorial Nautilus Hospital in July 1989 with complaints of back pain.  At that time, she was 29 years old.  She was given a diagnosis of acute and chronic lower back pain by the emergency room physician, and subsequently discharged.  So, in summary, your Honor, this is a lady who, within the relevant period, fell at work, with pain in her left shoulder and left hip, with diagnoses of shoulder strain and hip strain. She has controlled hypertension.  One episode in 19, one episode in 2006 where she complained about numbness and  tingling in her hands with suspicions for carpal tunnel syndrome.

ALJ:  Mm hmm.

ME:  But I do not see any severe physical limitation that would meet any listing, only that of a cardiovascular system for hypertension, which is 4.03.  On the –

ALJ:  Well, let, let, let us be real clear on the legal significance of your clinical opinion.  If, in fact, your conclusion is that the impairments, both singularly and in combination, are non-severe within the meaning of the definition in the Social Security Act, is not, it is not necessary to go further to identify the specific listing, at least in answer to my question.  Counsel may as[k] you on cross examination about a specific listing, but in answer to my question, I need to know only, in your opinion, whether there is or is not a severe impairment within the meaning of the Code.  And I took you to say that the answer to that was no.

ME:  Yes, sir.

ALJ:  I hear you say it twice.  Is that correct?

ME:  Yes, your Honor.

ALJ:  All right.  Now, Mr. Dewberry, whom I know very well, will ask you many questions, hopefully illuminating questions.

ALJ:  Your witness, sir.

13

Atty:  Thank you very much, your Honor.  I hope they are illuminating and not irrelevant, your Honor.

Atty:  Doctor, just a few questions.  You had indicated about an x-ray or MRI at 8-F, page 9, dating back to 1988.  Is that correct?  Was that the correct cite?

ME:  I think it was 10-F.

Atty:  10-F?  And that was an MRI?

ME:  Yes.

Atty:  And you indicated a mild bulge and —

ME:  I'm sorry.  Not MRI, CT.

Atty:  CT?

ME:  CT.  Lumbar spine.

Atty:  And again, could you just repeat the findings there?

ME:  Mild central disc bulge of the L5/S1 disk.

Atty:  Can that produce pain?

ME:  It can.

Atty:  On bending or stooping?

ME:  It can.

Atty:  And you indicated that there was mild narrow and too, is that correct?

ME:  Narrowed L5/S1 interspace.

Atty:  And when they say, what does that mean for a layman like myself?

ME:  Uh—

Atty:  Let me rephrase the question.  Are any nerves being pinched or squashed in there?

14

ME:  No.

Atty:  Can that impairment you just spoke of, the mild narrowing, cause problems on bending or stooping?

ME:  It can.  That's where we're talking about medicine.

Atty:  And—

ME:  So, what I'm trying to say is that, what I'm trying to say is in medicine anything is possible.

Atty:  Yes, sir.  Could this be the early beginnings of arthritis in the lumbar spine?

ME:  Yes.

Atty:  And is there any doubt in your mind she has arthritis in the lumbar spine?

ME:  Well, at least the x-rays from 1988 and the CT would suggest that, yes.

Atty:  And a couple more questions concerning the, concerning some x-rays.  2-F, page 5, is the MRI of the left shoulder, and it's dated, it, it's 2-F, page 5.

ME:  Yes.

Atty:  And it's dated 9/12/2002.  And I believe that's the left shoulder, if I'm correct.

ME:  That's one –

Atty:  Is that the –

ME:  – that was ordered by Dr. Armstrong?

Atty:  Yes.  Are, are, are we on the same —

ME:  2-F, page 5.

Atty:  Yes, sir.  MRI of the left shoulder.

ME:  MRI of left shoulder and also the hip.

Atty:  Yes, sir.  And dated 9/12 of 2002.

15

ME:  Yes.

Atty:  Okay, now you cited in your testimony the x-ray of the left hip.  You, I don't believe you mentioned the left shoulder.  So when you look at the analysis of the MRI of the left shoulder, you look at number 2, what does that mean?  Superior lateral humeral head subchondral cyst, suggestive of some degenerative change at site of rotator cuff insertion.  What do all those words mean?

ME:  Well, to go back to your initial question, I believe I said that she had a left shoulder x-ray when she had the injury by Dr. Armstrong.  That's on 3-C page 1.  She did have a left shoulder x-ray on August 5, 2002.  But to answer your question on the MRI, the superior lateral humeral head, the humerus is the head of the, the, the humerus, trying to explain.  The humerus is the bone at the upper part of your arm.  So what that is telling you, just an anatomical description of the positioning of where a cyst was seen, suggestive of some degenerative change at that site. That's all that is, just an anatomical description of a position.

Atty:  Could that be referring to arthritis when they said degenerative change?

ME:  Suggestive of some degenerative change at the site of the rotator cuff insertion, yes.

Atty:  And, this is of the left shoulder, could that cause pain upon movement of the left shoulder?

ME:  Possible.

Atty:  Now if you look at 3-F, page 2, which is a consultative evaluation for the Social Security, I mean for the Worker's Compensation Commission by Dr. DeBender [phonetic], 3-F, page 2, and I believe this is dated 1/14 of 2003.

ME:  Yes.

Atty: And one of his diagnostic impressions is 726.11.  Now I looked, I looked that up in you all's, that IC—

ME:  ICD-9.

Atty:  Yes, sir.  And it said calcifying tendonitis of shoulder.  Does that sound about right?  Let me just show you a copy of what—

ME:  Yes.

16

Atty:  —I, what I printed out of the book.  That's a —

ME:  726.11, calcifying tendonitis of the shoulder.  According to the ICD-9.

Atty:  So what shoulder do you think he'd be referring to, doc?

ME:  I don't know, because that is a, that is a, radiological diagnosis, meaning that you run an x-ray an MRI, and you see a calcium deposit, because you can't see a calcium deposit just on looking at the patient.  So I'm not sure on what basis that he's making that diagnosis, because we've looked at the MRI report and there was no mention of calcium or calcifying tendonitis.  So I don't know.

Atty:  What is calcifying tendonitis?  Bottom line, can calcifying tendonitis produce pain?

ME:  It can produce pain, because tendonitis, any time that you see an "itis" with any part of your body, "itis", I-T-I-S, means inflammation.  So tendon, tendonitis means inflammation of the tendon.  When you have inflammation of any organ, you can have calcium deposits.  So that really is a radiological diagnosis.

Atty:  So the record—

ME:  Because, because after you have shown there is evidence of a problem with a joint on chemical exam, then you do your x-rays or MRI showing inflammation and deposits of calcifying tendonitis, yes.

Atty:  And do you think that would affect the use of whichever, whichever shoulder he's referring to?

ME:  Yes, when inflammation is ongoing, yes.

Atty:  Now is this something, you said when the inflamation is ongoing.  Is this inflammation that would come and go, calcifying tendonitis, or is that something that would stay there?

ME:  It's usually treated with non-steroidal anti-inflammatory drugs, and that would include your Advil, your Motrin, your Celebrex, your Naproxyn.

Atty:  So, no when you impose on these problems here of the shoulder and of the back, I didn't hear you mention her weight.  We submitted to the Court, and I hope you received a copy of it–

ME:  yes.

17

Atty:  — a BMI of 47.4.

ME:  Yes.

Atty:  Is that of any significance in this case?

ME:  That would suggest obesity, because BMI is greater than 30.  So that's, that's the definition that I see on this piece of paper from the National Heart and Lung and Blood Institute, yes.

Atty:  Well, would you like to go through the height and weight in the records, and maybe you can compute it your own—

ME:  No, I have no reason to doubt this.  The record is pretty plain that she's overweight.

ALJ:  What'd you say the height and weight was?

Atty:  Five feet, five inches, and 280 .  And I'd like to, well, 285 now, but I can point out to the Court in the record, where that's in there a number of time .  For example—

ALJ:  Five feet, eight inches, that's, that's 68 inches, right?

Atty:  No, sir, five feet, five inches.

ALJ:  Oh.

Atty:  Oh.

Atty:  Oh, yeah, right, right, right,.

ALJ:  Sixty-eight inches.

Atty:  Right, right, right.

ALJ:  And you said two hundred and what?

Atty:  Eighty five.

ALJ:  All right.

Atty:  Is that 68 or 65?

18

ALJ:  You, she testified at 285, but—

Atty:  No, I mean the height, 5;5:.

ALJ:  Well, five times 12 is 60—

Atty:  Sixty.

ALJ:  Okay.  So, plus eight is 68.

Atty:  I don't think she's 5'8".  I think she's 5'5".  Well, I don't know–

ALJ:  How tall are you?

CLMT: 5'5".

ALJ:  Well, that's different.  Did I say 5'8", or did she?  Maybe I, maybe I said it wrong.

Atty:  When, whenever there's a disagreement, I always go with the Judge.

ALJ:  Well, yeah, all right, let's move on.  Six, go down the 65 column for 285.  Okay, that makes you fall between a 47 and 48 BMI.  Okay.

Atty:  And, Doctor, according to the body mass index, would that be considered on the high end of the body mass index?

ME:  Yes, that's obesity, yes.

Atty:  And would you look at the second page on there.  And at 47, give us your opinion as to how she would be described.

ME:  A 47, that would come in under extreme obesity.

Atty:  And when you have extreme obesity, are there a number of other problems that sometimes will go along with that?  Let me strike that question.  In this, in this case, there are x-rays which have indicated, of the lumbar spine, when you superimpose this weight on the lumbar spine, can that produce problems?

ME:  It can, yes.

Atty:  And what are normally the problem that it would create?

19

ME:  Well, we do know that with obesity—

ALJ:  While he's think, while you think about the answer to that, I want to, I want to ask you a question, counselor.

Atty:  Yes, sir.

ALJ:  Because we're focused on an early narrow period of time from the alleged onset date to the DLI, could you refer me to a reading of the lady's weight which was taken some time in that period?  It's been so many years, and in five year—

Atty:  Yes.

ALJ:  — a person could gain 50 pounds.

Atty:  Exhibit 4-F, page 19.

ALJ:  Okay.

Atty:  Dated 12/11/2003.

ALJ:  Okay, and what, what does that show?

Atty:  It has a weight of 283.

ALJ:  Okay, well, that's the same deal then. All right, good. That's, I just wanted to–

Atty:  Yes, sir.

ALJ:  make, make sure we were not fooling around with something that wasn't relevant. Okay.

Atty:  Yes, sir.

ALJ:  All right, Dr.Oguijiofer, do your best.

ME:  So, do we want to narrow it down to the musculo-skeletal system?

Atty:  No, I just want to know what, yeah, right.  Yeah, exactly, doctor, yes.  My question goes directly to the neuro-muscular system, primarily the back problem.

ME:  Yes.

Atty:  Yes, sir.  You're exactly right, yes, sir.

ME:  Well, we do know that obesity can exacerbate degeneration of your, of your joints.  So when you have evidence of wear and tear in the joints and degeneration, then obesity can exacerbate that, yes.

Atty:  So when you testified and the Administrative Law Judge was very clear in his questioning, so when you testified that what, let me rephrase the question.  Do you  still stand by your statement that, in your opinion, she has no severe impairment?

ME:  Yes, because within the relevant period stated, her main issues were that she fell at work and hurt her shoulder and her left hip.  And all of the investigations that were done pretty much unremarkable.  The issue of the back was way back in 1988, when she had back pain and had the x-rays and the MRI.  So within the relevant period, there were really no complaints or issues related to the back, or any evidence of compromise of her nervous system, meaning that if you have significant back problem with compression on the nerves, you're going to see evidence of sporadic neuropathy, wasting in the lower extremity, you know, nerve pain, radiation going down into your legs, and things of that nature.  So within that particular stated period, that the Judge, the question put across to me by the Judge, I felt, I feel that she does not have any severe impairment, yes.  (Tr. 475-488)

In addition, the record shows that a vocational expert, Joel Quintela, testified.  (Tr. 489-493).  On

April 9, 2008, the ALJ issued his decision. The ALJ, at step two, found that Johnson had no

severe impairments and therefore, was not disabled within the meaning of the Act.  The ALJ's

findings and decision thus became final.  Johnson has timely filed her appeal of the ALJ's decision.

42 U.S.C. § 405(g).  The Commissioner has filed a Motion for Summary Judgment (Document

No. 12), and a Memorandum in Support thereof.  (Document No. **15**).  Johnson has filed a

Motion for Summary Judgment (Document No. 14).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 494.  (Document No. 8).

There is no dispute as to the facts contained therein.

21

### III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance."  *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence

22

must create more than "a suspicion of the existence of the fact to be established, but no `substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If  the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

The ALJ concluded at step two, based on the medical evidence, that Johnson had no severe impairments or combination of impairments, which have lasted or which could last for 12 continuous months.  The ALJ wrote:

**3.  Through the date last insured, the claimant had the following medically determinable impairments:  left shoulder strain, hip strain, obesity and hypertension.  (20 CFR 404.1520(c)).**

**4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited her ability to**

**perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521).**

Basic work activities are the abilities and aptitudes necessary to do most jobs. Examples of these include:

1.  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2.  Capacities for seeing, hearing, and speaking;

3.  Understanding, carrying out, and remembering simple instructions;

4.  Use of judgment;

5.  Responding appropriately to supervision, co-workers, and usual work situations; and

6.  Dealing with changes in a routine work setting.  (SSR-85-28).

In reaching the conclusion that the claimant does not have an impairment or combination of impairments that significantly limits her ability to perform basic work activities, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.  The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-stop process in which it must be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques– that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a

finding on the credibility of the statements based on a consideration of the entire case record.

The claimant alleges an inability to work due to problems with her back, hip and left shoulder.  It was the testimony of the claimant that she is in a lot of pain despite taking her pain medication as prescribed.  The claimant also alleges an inability to work, in part, due to carpal tunnel syndrome.  As to the claimant's obesity, it was her testimony that she has tried diets but has not talked to her physicians about her weight.  As to functional limitations, the claimant stated that she is only able to lift 5 pounds.  With respect to daily activities, the claimant stated that she lies down during the day for approximately 4 hours.  Regarding side effects from medication, the claimant stated that she experiences drowsiness, dizziness, frustration and problems with her attitude.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments for the reasons explained below.

In terms of the claimant's alleged allegations of disabling pain, the objective medical evidence fails to support the allegations of the claimant.  Factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation or persistent significant limitations of range of motion, muscle spasm, muscle spasm, muscle atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medications.  *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  None of the claimant's examinations disclosed the above findings to any significant degree.

Treating records from the Doctor's Hospital-Tidwell dated September 9, 2002, reveal that the claimant experienced a work-related injury.  At that time, the claimant injured her left shoulder and hip (Exhibit 2F, page 2).  However, radiological findings of the claimant's left shoulder performed on September 12, 2002, showed no fractures or dislocations.  Likewise, radiological findings of the claimant's left hip performed on September 12, 2002, showed no fractures or dislocations (Exhibit 2F, page 7).  Also, at that time, an MRI scan of the claimant's hips was normal (Exhibit 2F, page 5).  Moreover, an MRI scan of the claimant's left shoulder showed no rotator cuff tear with intact biceps tendon.  MRI findings indicated superolateral humeral head subchondral cyst, suggesting some degenerative changes at the side of the rotator cuff insertion.  Nevertheless, it was

26

stated that there was no evidence of any atrophy and the claimant has normal alignment of the shoulder (Exhibit 2F, page 5).

On October 2, 2002, John J. DeBender, M.D., examined the claimant and concluded that the claimant had only strain of the left hip and left shoulder. Upon examination, the claimant has full range of motion of the left shoulder with pain only at the end of motion. There was only mild tenderness over the anterior and lateral acromial area. Sensation was normal and the claimant has good strength with abduction and elevation. With respect to the left hip, the claimant has pain with internal and external rotation of the hip. Nonetheless, she had full flexion and extension. Neurovascular status was intact (Exhibit 3F, pages 9 and 10). When seen by Dr. DeBender, on December 30, 2002, the claimant had recently completed her work hardening program and reported that symptomatically she was much improved. Neurological examination was intact. Dr. DeBender noted that the claimant should only return as needed and did not require follow-up appointment. This suggests that Dr. DeBender was of the opinion that the claimant did not require any ongoing treatment for her shoulder or hip. The claimant was given only a 4 percent whole person impairment (Exhibit 3F, pages 7 and 8). Thereafter, the medical record is absent of any ongoing treatment until December 11, 2003, when the claimant presented to the Harris County Hospital District. At that time, the claimant reported she was still experiencing left side pain. Upon examination, the claimant was found to have full range of motion of the shoulder. X-rays of the claimant's left scapula were normal. Likewise, radiological findings of the claimant's thoracic spine performed on December 11, 2003, showed only mild scoliosis. There were bony spurs of spondyloarthritic nature at T-11-T12 (Exhibit 4F, pages 19, 20 and 21).

With respect to the claimant's hypertension, when seen on March 9, 2002, and December 20, 2002, the claimant's blood pressure reading was 120/80 (Exhibit AC-3, pages 2 and 6). Again, on May 16, 2003, the claimant's blood pressure reading was normal at 120/80 (Exhibit AC-3, page 3). A careful review of the objective medical evidence fails to provide any evidence of hypertensive crises.

Despite the claimant's allegations of disabling problems with her hands and left shoulder, it was her testimony that she was able to cut her children[s] hair until last year, which was well before her date last insured.

In evaluating this case, the undersigned sought the assistance of Albert Oguijiofor, M.D., a medical expert who is board certified in internal medicine. Dr. Oguijiofor summarized the objective medical evidence, noting the claimant fell at work in August 2002 and sustained left shoulder contusion and strain and left hip contusion and strain. He stated that radiological findings in August 2002 were absent of any acute abnormalities in the shoulder or hip. The medical expert further testified that

27

the claimant has a history of degenerative disc disease of the lumbar spine based on radiological findings in 1988.  At that time, the claimant was found to have narrowing between the disc spaces between L5 and S1 and mild central disc bulge of the L5-S1 space.  Although Dr. Oguijiofor stated that these findings could produce pain on bending and [stooping], there was no evidence of nerve impingement.  In addition, Dr. Oguejiofor stated the claimant has hypertension, which is controlled with medication.  Upon cross-examination, Dr. Oguejiofor testified that radiological findings of the left shoulder dated September 12, 2002, which revealed superolateral humeral head subchondral cyst suggestive of some degenerative change at the site of rotator cuff insertion provided an anatomical description of a position of a cyst that was suggestive of degenerative changes.  He noted further that it was possible that the claimant may experience some pain from this condition.  With respect to the diagnostic code of 726.11 given by John DeBender on January 14, 2003, Attorney Dewberry indicated that his diagnostic code was for calcified tendonitis of the shoulder.  Dr. Oguijiofor stated that this is a radiological diagnosis and he is unsure of the basis for this diagnosis.  Nonetheless, Dr. Oguejiofor  [ ]stated that this condition is usually treated with inflammatory drugs.  When asked about the claimant's obesity, Dr. Oguejiofor [ ] stated that the claimant has a Body Mass Index over 30 and is considered obese.  However, Dr. Oguejiofor stated that the claimant's primary complaints during the relevant period under consideration have been her hip and shoulder subsequent to her work related injury.  He further stated that there is no evidence of an issue with the back during the relevant period under consideration  He noted that there is no evidence of any radiculopathy symptoms or neurological deficits.  Based on his review of the objective medical evidence, it was the opinion of Dr. Oguejiofor that the claimant did not have a severe physical impairment.  The undersigned finds the assessment of Dr. Obuejiofor to be credible and consistent with the objective medical evidence.

As for the opinion evidence, the undersigned has considered the physical residual functional capacity questionnaire completed by Davill Armstrong on August 10, 2006.  At that time, it was his opinion that the claimant was able to sit for 15 minutes at a time for a total of about 2 hours in an 8-hour work day and stand for 10 minutes at a time for total of less than 2 hours in an 8-hour workday.  It was further opined that the claimant should have an opportunity to change positions at will and take unscheduled breaks during the workday.  Dr. Armstrong opined that the claimant was able to lift and carry less than 10 pounds occasionally.  It was the opinion of Dr. Armstrong that the claimant would likely be absent for more than four days per month.  In support of this conclusion, Dr. Armstrong noted the claimant to have pain in the left shoulder, hip and lower back with restricted motion in the left shoulder, hip and lower back.  In addition, he noted the claimant to have carpal tunnel syndrome (Exhibit AC-2).  However, the objective medical evidence fails to support the assessment of Dr. Armstrong.  In progress notes

28

dated August 16, 2002, the claimant was documented to have tenderness of the left hip and decreased range of motion. However, the undersigned notes that the severity of the decreased range of motion was not given. This is important especially when prior progress notes, as discussed above, noted the claimant to have essentially normal range of motion. Interestingly, there was no mention of any complaints of back pain or carpal tunnel syndrome (Exhibit AC-3, page 5). When seen subsequently on December 20, 2002, the claimant's range of motion in her left shoulder was described as "ok" (Exhibit AC-3, page 2). Moreover, the undersigned notes that assessment completed by Dr. Armstrong was completed well after her date last insured. Based on the foregoing reasons, little weight is afforded to the assessment of Dr. Armstrong.

While no doubt the claimant has some pain and discomfort associated with her condition, such symptoms are found to be mild to moderate at most. It is well settled, as a matter of law, that the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of total disability. *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980). Thus, her allegations concerning her subjective symptoms are found to be credible to the extent that she is unable to perform basic work activities.

Having carefully review[ed] the evidence, the Administrative Law Judge finds that the claimant's impairments have not been demonstrated to more than slightly limit the claimant's ability to perform basic work-related activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting (20 CFR 404.1521(b)). The Administrative Law Judge considered the claimant's subjective complaints in light of Social Security Ruling 96-7p and 20 CFR 404.1529. Consequently, the claimant does not have a "severe" impairment, as that term is defined in the Regulations. In arriving at this conclusion, the term "severe" as defined in the Regulations has been given the same construction as that pronounced by the United States of Appeals for the Fifth Circuit. *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). In sum, the conclusion that the claimant does not have an impairment or combination of impairments, including obesity that significantly limits her ability to perform basic work activities is supported by the objective clinical findings. Specifically, the claimant has no neurological deficits, no significant orthopedic abnormalities, and no serious dysfunctioning of the bodily organs that would significantly limit the claimant's ability to perform basic work related activities. (Tr. 19-24).

The Court must determine whether substantial evidence supports the ALJ's step two finding.

At step two, the claimant bears the burden of showing that she has a severe impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities.[10]   The step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." *Smoven v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987)).   The Commissioner's regulations describing step two, state:  "If you do not have a *severe* medically determinable physical or mental impairment ... or a combination of impairments that is severe ..., we will find you are not disabled."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (emphasis added).   The regulations require a claimant to show only "*a* severe" impairment, that is, *one* severe impairment in order to avoid a denial of benefits at step two.  As such, the failure to find a particular impairment severe at step two is not reversible as long as the ALJ finds that at least one other impairment is severe.  Moreover, even if an impairment is found non-severe at step two, at step four, an ALJ must "consider the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [RFC]."  20 C.F.R. §§ 404.1545(e), 416.945(e); *see also* Social Security Ruling 96-8P, 1996 WL 374184, at *5.  In *Stone v. Heckler*, 752F.2d 1099 (5th Cir. 1985), the Fifth Circuit discussed step two and opined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's

---

[10] The ability to do most work activities encompasses "the abilities and aptitudes necessary to do most jobs."  *Williams v. Sullivan*, 960 F.2d 86, 88 (8th Cir. 1992).  Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work situation.  *Id.* at 88-89; 20 C.F.R. § 1521(b).

ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984). The regulations provide "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity." *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999); 20 C.F.R. § 404.1523. Even though the burden at step two lies with the claimant, the claimant need only make a minimal  showing to move to the next step in the five step sequential process. With respect to a minimal showing, the mere presence of a condition or ailment is not sufficient to make a step two showing. *See Bowen,* 482 U.S. at 153.

Johnson contends that the ALJ erred in denying her application at step two. According to Johnson, the ALJ misapplied the prevailing standard set forth in *Stone* that applies in the Fifth Circuit. Johnson maintains that even though the ALJ stated that he was following the Fifth Circuit's decision in *Stone*, the substance of his decision shows otherwise. In support of her contentions, Johnson cites to *Scroggins v. Astrue,* 598 F.Supp. 2d 800 (N.D. Tex. Jan 27, 2009), which like the instant action, was decided at step two, and where the ALJ, like the ALJ here, cited to  the *Stone* standard but applied an incorrect standard.  The Commissioner, in response, contends that remand is not warranted because the ALJ not only referenced  the *Stone v. Heckler* decision in concluding that Johnson's impairments did not constitute severe impairments within the meaning of the Act, but also stated that the term "severe" had been given the same construction as the Fifth Circuit pronounced in *Stone*, before concluding that Johnson did not

have an impairment that significantly limits her ability to perform basic work activities and that she

had not demonstrated impairments that "more than slightly limit [her] ability to perform basic

work-related activities." (Tr. 23). The Commissioner further argues that the medical records do

not support Johnson's contention that she had severe impairment(s) and that the ALJ did not err

in rejecting the conclusory opinion by Dr. Davill Armstrong.

The Court, having reviewed *Scroggins*, and its progeny, [11] finds that the ALJ misapplied

the *Stone* standard and as such, the matter must be remanded. In *Scroggins,* the ALJ concluded

that impairments were not severe because they "would have no more than a minimal effect on an

individual's ability to work." *Id* at 800. Here, the ALJ concluded that Johnson's alleged

impairments could have, at most to "slightly limit the claimant's ability to perform basic work-

related activities." (Tr. 23). *Stone* holds that a severe impairment "would *not* be expected to

interfere with the individual's ability to work." 752 F.2d at 1101 (emphasis). Under *Stone*, a

non-severe impairment is not expected to interfere with the individual's ability to work. The

ALJ's interpretation allows a finding on non-severe even where, they have a "slight" effect, on her

---

[11] The Court in *Ruby v. Astrue*, (No. 3-08cv1012-B (BF), 2009 WL 4858060 at *8 (N.D.Tex. Dec. 14, 2009) wrote:

> The "minimal effect on an individual's ability to work" definition that the ALJ used in this case is not the standard set forth in *Stone*. In the Fifth Circuit, the appropriate legal standard for determining whether a claimant's impairment is severe is *de minimus*....The United States District Court of the District of Texas is consistent in its refusal to find that the standard applied in this case is the standard set forth in *Stone*. Unlike the standard that the ALJ applied, *Stone* provides no allowance for the minimal interference on a claimant's ability to work. Although this court has recognized that the difference between the two statements may appear to be slight, the ALJ's construction is not an express statement of the *Stone* standard. This difference, coupled with the ALJ's failure to cite *Stone* or a similar opinion, or to expressly mention the Fifth Circuit's interpretation of the regulation, constitutes the ALJ's application of an incorrect legal standard and requires reversal and remand for legal, rather than procedural, error." (Citations omitted).

ability to work.  *See also Rangel v. Astrue*, 605 F.Supp. 2d 840, 850-851 (W.D. Tex. Mar. 6, 2009).  Because this Court is bound to follow *Stone*, and given clear instructions by the Fifth Circuit to remand a matter in which *Stone* was not followed at step two, the matter must be remanded.  *See Loza v.* Apfel, 219 F.3d 378, 393, 398-99 (5th Cir. 2000).  Accordingly, the matter should be remanded to the Commissioner for proceedings consistent with this Memorandum.

With respect to obesity, SSR 02-1P addresses the policy of the Social Security Administration concerning the evaluation of obesity.  According to the Ruling, "obesity is a complex, chronic disease characterized by excessive accumulation of body fat."  SSR 02-01p. Even though a claimant such as Johnson may be obese, it does not follow that the claimant has a severe impairment of obesity.  To the contrary, the Ruling provides, "[t]here is not specific level of weight or BMI that equate with a 'severe' or a 'not severe' impairment.  Neither do descriptive terms for levels of obesity (e.g., "severe," extreme" or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes.  Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."  The Ruling states that a claimant's Body Mass Index (BMI) is one measure of the degree of obesity.  Here, Johnson had a BMI of 47. While the ALJ characterized Johnson's obesity as merely "obesity", the medical advisor, based on Johnson's height and weight, characterized it as "extreme."  SSR 02-01p instructs that a claimant's obesity must be considered not only at step two of the Commissioner's five step process, but also at the subsequent steps:

> The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  An assessment should also be made of the effect obesity has upon the individuals ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time .... [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular continuing basis....  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.  This may be particularly true in cases involving sleep apnea.
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight -bearing joint may have more pain and limitation than might be expected from arthritis alone.

*See also* 20 C.F.R. § 404.1523 (explaining that if the Administration finds "a medically sever combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.")  SSR 02-01p is binding on all components of the Administration.  *See*  20 C.F.R. § 402.35(b)(1).   The ALJ briefly mentioned obesity, but discounted it because Johnson had not talked to her physicians about it and had tried to diet.  The ALJ's analysis failed to consider the severity of Johnson's obesity, and failed to explain, within the spirit of SSR 02-01p,  how he reached his conclusion concerning obesity at step two, especially given that is was well documented in the record that Johnson suffers from "extreme obesity", and further given the medical evidence which showed that Johnson had, arthritis in her left hip and possibly left shoulder, and the effect, if any, it would have on her alleged impairments.  Because Johnson's obesity was not considered in a manner consistent with SSR 02-01p,  it should be reconsidered on remand in light of SR 02-01p.  To the extent that there was little evidence before the ALJ from health care providers which directly addresses Johnson's extreme obesity and any limitations resulting therefrom, the ALJ should develop the record on the issue of  Johnson's

obesity and how her obesity impacted her ability to function and work, as outlined in SSR 02-01p. Finally, with respect to Johnson's alleged left shoulder impairment, based on the testimony of the medical expert that there is uncertainty concerning whether calcified tendonitis of the shoulder was based on radiology results or was a clinical diagnosis, the record should be developed fully on this point.

## V. Conclusion

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner did not properly follow the guidelines propounded by the Social Security Administration and applicable case law at step two and that further development of the record is necessary. Based on these infirmities in the ALJ's opinion, substantial evidence does not support the ALJ's decision. The Magistrate Judge ORDERS that the Plaintiff's Motion for Summary Judgment (Document No. 14) is GRANTED, that Defendant's Cross Motion for Summary Judgment (Document No. 12) is DENIED, and the matter is REMANDED to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 11th day of January, 2010.

Frances H. Stacy
United States Magistrate Judge